Ms. Sullivan. Mr. Chief Justice, and may it please the Court, the False Claims Act asks very little of a private Quaytam relater who would step into the government's shoes, file under seal, serve only on the government, and maintain the seal until it is lifted. Respondents here violated that requirement. They leaked the content and existence of their suit to the Associated Press, ABC, and the New York Times. And yet, under the rule adopted by the Court of Appeals, they suffered no consequence whatever for that violation. This Court should reverse or vacate and hold that such bad faith, willful, and severe violations warrant dismissal under any appropriate test. Did you seek any sanction for the seal violations in this case other than dismissal? We did not, Your Honor. We sought dismissal repeatedly. Why not? Well, Your Honor, we think dismissal is the appropriate sanction, and that any alternative sanction would be toothless here. For just to begin the case. From perhaps from the defendant's point of view, but I thought the whole purpose of sealing the materials was not to tip off the defendant. And if that's so, then the defendant would benefit from being tipped off. And the government, who I think you agree is the primary concern of Congress to be protected, the government, then would be left with the choice of either dropping the suit, or expending its own resources on it. So the one who's really penalized, in addition to the key tamplate gifts, is the government. Your Honor, we think that Congress intended a statutory bargain that does not give the government absolute discretion to decide whether the seal has been violated. And let me explain first what the statutory bargain is. The statutory bargain set forth in 3730b-2 is the relator gets the litigating authority of the government, it gets to share in any award the government might obtain, but on condition, on a mandatory condition, that it abide by the simple requirements I mentioned of keeping the complaint under seal. Ginsburg-McGillivray But if it's a condition for the government's benefit, the government can waive it. Well, Your Honor, we don't agree with that. We don't. We think that Congress could have said that the seal should be maintained at the Attorney General's discretion. It did not say that. It said the seal was valid. Kennedy The defendants have a stronger interest in having the seal requirement followed than the government does. Ginsburg-McGillivray Respectfully, I disagree, Your Honor. Kennedy The point of the question. Ginsburg-McGillivray Yes. But let me go back to the question. The government does have an interest in having the seal maintained. The seal is under the 86 amendments. It's required in order that the government may investigate the claims, decide whether to intervene, and also pursue any criminal investigations that might have already commenced in light of the complaint. But that doesn't just protect the government's discretion. It protects the operation of the statute. And the way it does that is it gives the government a period of time in which it may decide to do any of three things, intervene and conduct the Keaton case, decline to intervene, or, as happens in very many cases, settle the case with the defendants before the seal is lifted. And as the Second Circuit said in Pilon, which we think gives the best version of a discretionary test, the incentives for settlement, which benefits the taxpayers and the Treasury, will often disappear if a potentially meritorious complaint is filed and a defendant is willing to reach a speedy and valuable settlement with the government in order to avoid unsealing. So you're arguing the government's interests, but it rings a little hollow when we see that the government's on the other side. Yes, Mr. Chief Justice. I'm in a difficult position arguing that we serve the government's interests better than the government suggests. But let me say why I think it's very important not to see this as something that is the government's seal to be maintained at the government's discretion. When Congress sets a mandatory precondition to suit, this Court has always held that the requirement merits dismissal. Hallstrom is the case most clearly on point, because the plaintiff could refile. It wasn't – it was a – it required notice, so the plaintiff could then give the notice and bring the suit again. But on your view, these plaintiffs are out, irretrievably. Your Honor, and if I make no point clearer today, let me make this point clear. The suit does not go away on our rule. The relators go away on our rule. The government. Yes, but that puts the government to the choice of not having the relator to go forward for it, and it has to either take up the reins itself or say, well, we have too many other things on our plate, we have to let it go. Your Honor, the government here is free to intervene even after the relators are dismissed, no matter how late it is in the suit. The provision of 3730 – the provisions of 3730 allow the government to intervene for good cause later, and 3731 allows the government to have its late-intervened suit relate back to the time of the relator's complaint. So there's no statute of limitations problem. Sotomayor, but the government starts again. It does, Your Honor. The judgment that was entered here would be nullified. That's correct, Your Honor, but the same thing happened in Hallstrom. Hallstrom considered and rejected the argument that wiping out the judgment in that case would waste the resources expended. And the reason – You are – please, sorry. Sorry, Justice Kagan. No, please. Just to – I just want to make the point that if the government has already intervened, which it didn't do in this case because three years of investigations found no fraud, if the government has already intervened, then Justice Ginsburg's dilemma will never occur. The government is already conducting the suit. So the only cases we're talking about in the small universe of cases that involve seal violations in the first place are non-intervened cases in which the government might not have intervened but want to do so later. And my point is there's no prejudice to the government or the Treasury because the government can come in later, relate back, and reconduct the suit if it finds it's a meritorious case. You have to try to – I – You mentioned Hallstrom a couple of times. Yes, Your Honor. And rely on it heavily in the briefs. But Hallstrom has very different statutory language. Hallstrom says no action may be commenced unless a condition is met. And similarly, in 3730, the statute uses language that makes it clear that dismissal is appropriate when a mandatory requirement is not met. It says the court shall dismiss an action or claim. It says in no event may a person bring an action. It says the court – no court shall have jurisdiction. All of that way of phrase – all of those phrasings indicate what happens when a requirement isn't satisfied. But there's no such language with respect to this requirement. I mean, it's a mandatory requirement, but it doesn't say what happens if the requirement isn't satisfied. And that makes it very different from Hallstrom and from the other language in Section 3730. That is correct, Your Honor. We do not have an express statement of what the remedial sanction is for a violation of the seal. But RCRA was silent, too, on the remedial sanction for a violation of the pre-filing notice requirement, and yet this Court nonetheless held the mandatory precondition not being met, dismissal was the appropriate sanction, and also stated expressly that the requirement was not jurisdictional. So, Your Honor, Hallstrom really was the same exact case functionally as our case. Here's the difference. Ginsburg-Miller I thought about the point that I made before with respect to Hallstrom. Hallstrom didn't put the plaintiffs out of court. It said they have to give the required notice, they have to give the notice to the government, the alleged violator, and I thought the purpose of that was to give the violator a chance to clean things up so there wouldn't be any suit. So those plaintiffs, if I understand Hallstrom right, just give the notice, wait the suit again. Yes, Your Honor, and as I said before, the government can come in under 3730c3 and have its complaint relate back to the relator, so it's similar to the plaintiffs in Hallstrom. But to answer Justice Kagan's question, the only difference between our case and the Hallstrom-type pre-filing waiting period comes from the peculiarities of the QI-TAM statute, and in particular from the peculiarities of the QI-TAM statute that benefit relators. And what I mean by that is what was the 1986 bargain? Congress wanted to encourage relators to come forward, and so it said we're going to give you new, larger bounties and financial incentives. But we're worried that if we encourage you to come forward, you might impair government investigations. But we worry if we make you wait first before you file, you might lose your right to sue. You might have some other relator beat you to the post and file first, or the government might file, and then you'd be out of luck. So in order to protect the relators, the QI-TAM statute does it backwards from Hallstrom. It says file sorry, file first, wait second, whereas in Hallstrom it accomplished the exact same purpose under RCRA, wait first, file second. It was in order to protect relators that this statute, the 86 amendments to the QI-TAM statute, say relator, file first, but keep it under seal to protect the government's right of first refusal. Well, they might have the Alito, you have two arguments. One is that dismissal is mandatory. The other is that the district court and the court of appeals applied the wrong standard in determining not to dismiss here. As to the first, what would you say about the case where the disclosure is very limited, seen by only one person, let's say, it was inadvertent, it was not done in bad faith, and it causes no harm? You would say dismissal is required, even under those circumstances? Not necessarily, Your Honor. We think that dismissal is required where a disclosure rises to the level of a violation. But as some district courts in per se dismissal jurisdictions have held, we cite the Omnicare-Gale case that's in the Sixth Circuit, which follows a per se dismissal rule. The court found that a mere private disclosure to a spouse may not, a trivial disclosure, may not rise to the level of a violation. And, Your Honor, we think that the district courts can find safety valves in a per se dismissal rule by finding that such trivial disclosures don't rise to the level of a violation. Breyer, that's not this question. I have the same question. That doesn't sound like a per se rule, then. A per se rule with de minimis exceptions, Your Honor. But under our alternative argument, and, Justice Breyer, I definitely want to get to your question, but under the rule, so let me try, let me just answer, finish the answer by saying we argue in the alternative that if there's going to be a discretionary standard akin to traditional equitable discretion, then bad faith should be the primary factor, and harm should be measured by the severity of the violation should be measured by what the relator did or the relator's counsel did at the time of the disclosure, not the consequences, its character, not its consequences, ex ante, not ex post, and that actual harm to the government should not be a requirement. Breyer, once you're there, I mean, my thought was the same as Justice Alito's. A vast range of violations, some don't hurt really at all, some are sort of accidental, some are certainly not bad faith and they didn't cause much trouble. Really, why dismiss the case? And once you begin to agree with that, you're into argument two. Once you're into argument two, what do you think of the Lujan factors? Your Honor, we don't think that the Lujan factors were properly articulated or applied in this case. So what we think is the better rule is the one that comes from the Second Circuit, not the Ninth and Fifth Circuits, and that rule would look to bad faith as an important factor, sometimes a dispositive one, and there's no question that the conduct here was in the utmost bad faith. You had lawyers deliberately leaking to national news outlets in hike verba the contents of the complaint and the evidentiary disclosure. Breyer, the clients did not know that. Your Honor, that's not correct on this record. The Fifth Circuit. On the record, does it show they did know it or that they didn't know it? Correct, Your Honor. No, no, not correct. It was a question. Either they did know it or they didn't know it. What does the record say about that? The record the Fifth Circuit assumed that the lawyers' conduct could be imputed to the relators. So, but did on the question of whether they knew it. Your Honor, we think that no. Why did you never ask them or the lawyer? Well, Your Honor, we did ask them whether they authorized the conduct. They said no. So there's no. So here we have ambiguity as respect to that. Could I write an opinion that said the Lujan factors are some factors, life is complicated, there are all kinds of factors, and these factors affect the basic fairness of the situation, which is something the judges should look to as well. Like many, many, many decisions, this is conferred upon the Supreme Court, upon the district court to make a fair decision in terms of sanction in light of the circumstance to be reviewed by abuse of discretion. Your Honor, in this case, it was an abuse of discretion not to dismiss on the understanding of facts. I don't have to worry about this case. You do. And I have to worry about the right standard to write an opinion. Correct, Your Honor. And let me suggest respectfully why you should, at a minimum, vacate and remand for resolution of any remaining fact questions about imputation or the like. And that is because the articulation of the standard by Lujan, the court below, and courts following this toothless test basically have invited open season on deliberate bad faith leaks to the press. If you affirm and say this was good enough for abuse of discretion, then further, Mr. Chief Justice. I was just going to add, I thought your very, the very first question was that you didn't, your answer was that you didn't seek any sanction other than dismissal. So I'm not quite sure your fallback argument is before us. It is, Your Honor, because dismissal should have been granted under a proper discretionary test if you reject our per se rule. And we think with respect to the application of any rule other than dismissal. We asked for dismissal, and we asked for dismissal urging at a minimum a test that would take bad faith into account. If the most important feature of the decision below is it gave the back of its hand to deliberate bad faith conduct. Roberts. Roberts. So if we go back, and I haven't done this, and look at the way the case was litigated, is there an argument from you that says, okay, if you're not going to automatically dismiss this case as we argue, you should do this as a second alternative? Yes, there is, Your Honor. We preserved at every stage the argument that if there's no per se dismissal, there should be dismissal based on a proper balancing test. We urge that a balancing test should, number one, make bad faith primary. But again, you didn't ask for any sanction other than dismissal. That is correct, Your Honor. Attorney discipline would do no good in a case where Mr. Scruggs had already been indicted and disbarred for reasons having nothing to do with his deliberate seal violations here. And monetary sanctions with respect, which are touted by the Respondents and the government as the solution, are not going to have any deterrent effect in a case. Sotomayor So I do have one fundamental factual question. Yes, Your Honor. As I'm reading the record below, the circuit, the Fifth Circuit, took the position that the only disclosure that would violate the seal requirement is the disclosure of the existence of the lawsuit. It basically said that disclosing the underlying facts is not a violation of the sealing requirement. So how did the mere disclosure of the lawsuit hurt you, as opposed to what I think hurts reputation, is the nature of the allegations? If the allegations were going to come out no matter what, how and why and when was there an actual disclosure of the existence of the lawsuit as opposed to just sharing with others what I understood to be the evidentiary affidavit, which just sets forth allegations? So, Your Honor, there is no question here that the existence of the complaint under the False Claims Act was literally revealed. The evidentiary disclosure supporting the complaint, which mirrors the allegations of the complaint itself, was e-mailed to three national news media, to the AP with the caption on the front, but in all instances with the signature block saying attorney for relators in this False Claims Act, and with the certificate of service on the attorney general and the U.S. attorney. So this is the rare case where you do not have to consider any factual ambiguity about whether the complaint itself was distributed to the public. ABC, the AP, and the New York Times are the public. Second, Your Honor, there may be other cases, unlike this one, in which it's a harder case, in which maybe someone's just talked about fraud in the air. But I thought the question was, suppose these plaintiffs didn't reveal the complaint at all, but they described on a radio show, on a TV show, what they understood to be State Farm's practice. So the information came out, but not that they had filed a complaint. Your Honor, that would be a different case. You haven't reached it. You don't need to reach it here. A divided panel of the Fourth Circuit, with a very strong dissent by Judge Gregory, said maybe there – maybe there is a First Amendment right to talk about fraud. Kennedy. Let us assume for the moment that there is a First Amendment right to discuss the actions that took place. How – then do you answer, Justice Sotomayor's and Justice Ginsburg's question is that the harm here that you're talking about could have occurred with First Amendment protection. Let's assume there's a First Amendment protection. How then would you answer the question? Then, Your Honor, if fraud was discussed without revealing the existence and content of the complaint itself, then there would not be a violation and the per se rule would apply, which is why our per se rule is narrower and less absolute than my friends on the other side have portrayed it. But, Your Honor, there may be times when a revelation of fraud and not the words here's our False Claims Act complaint, which was the case in this record, in which the revelation of the fraud was the functional equivalent of revealing the complaint. If a lawyer goes up on the courthouse steps, comes out on the courthouse steps and talks about fraud, and then points to his briefcase and says, well, I can't – if somebody says, well, did you file a complaint, no, I can't talk about it, there might be instances in which the exercise of First Amendment rights becomes the functional equivalent of fraud, and the district courts can work that out in deciding whether a disclosure rises to the level of a violation, but you don't have to face that here. What you need to face here is a case where lawyers violating every possible obligation under the statute, as well as their ethical obligations, and whose conduct should be imputed to the relators, as the Fifth Circuit assumed, leaked the actual complaint in its legal content to three national news media. Kagan. Kagan. You said your test would put – would make bad faith primary. What exactly does that mean? I mean, take a case where there was bad faith, but, in fact, it was also a pretty minor breach that was not likely to cause any harm, and, in fact, did not cause any harm, and the government comes in to the district court and says it's not in our interests for this case to be dismissed. Why should the court nonetheless dismiss the case? Your Honor, under our balancing test, it might not on those facts. Bad faith can't be dispositive if the other factors overwhelm it. But here the – Well, then what does it mean for bad – why do you say – is it – how is it first among equals? Why isn't it just something that a district court should take into account, as this district court took it into account? Your Honor, we don't think the district court or the court of appeals did take bad faith into account. And if you look at the government's brief at page 28, you'll see that the United States didn't seem to take bad faith seriously here either. That is a – is an error, that as a matter of law in the application of the balancing test, and we think bad faith plus severe harm makes an easy case for dismissal here. And let me say why the severe harm should be assessed differently than the Fifth Circuit did. The Fifth Circuit here took an ex post rather than an ex ante approach. It said, as you just suggested in your hypo, let's look at the consequences. Did anything bad happen? The statute asks you to take an ex ante perspective. It says don't violate the CLS deterrent. Kagan. When – when – when one factor is the seriousness of the violation, presumably one measures the serious – seriousness of the violation by asking whether the violation is likely to cause harm ex ante. So it's really looking to both. It's calling them different things, but it's saying we're going to check out the seriousness of the violation, whether it's likely to produce harm, what the risk of harm is, and we're going to ask, in ways we ask in the law all the time, did it, in fact, cause that harm? Your Honor, we don't tend to let drug dealers off if the thing they think is marijuana that they're selling turns out to be oregano. We do care about state of mind at the time, and we don't just look to the accident or happenstance that it didn't cause harm, in fact. Here, the courts, by looking to the consequences, failed to describe as severe, and the government actually calls this a minor violation, to leak the contents of a complaint to national news media. If you affirm you are sending a message to every relator in the country in key TAM suits and their counsel, leak away with no consequence. And, Justice Sotomayor, monetary sanctions to complete the answer before are not going to be effective. The Bibby case touted by the government at pages 23 to 24 of the government's $43 million to $41.5 million as the monetary sanction, that will not be an effective deterrent. So dismissal can you tell me, just to clarify what 3730B means, when it says the action may be dismissed only if the court and the attorney general give written consent to the dismissal and their reason for consenting. I can, Your Honor. That applies to voluntary dismissals, as has been settled by an unbroken line of court of appeals decision. It does not apply to dismissals ordered by a court. And we think whether you adopt our per se rule under Hallstrom or a better version of the discretionary rule than the toothless one adopted by the court of appeals below, a court-ordered dismissal is the appropriate sanction for a bad-faith leak to national news media. And, Justice Kagan, to go back to your question. If there is a primary factor, why shouldn't the primary factor just be what the government wants? In other words, why shouldn't this be, given that the government is the beneficiary of this provision, why shouldn't we give very significant discretion to the government? Your Honor, this is a case of pure statutory construction. There's no need to defer to the government. Second, actual harm is very hard to prove. How can the government know if an unscrupulous defendant has destroyed evidence or sent witnesses out of the country? And last and most important, Your Honor, the government never says it's been harmed. It has no incentive to do so. There's only one case that we found in 30 years of Ketam cases in which the government admitted there was actual harm. And that is not a basis on which you should police this requirement. I'd like to reserve the balance of my time, Mr. Chief Justice. Roberts. Thank you, counsel. Mr. Singh. Mr. Chief Justice, and may it please the Court. The question in this case is, as the first half hour illustrates, not really whether courts will punish and deter violations of the False Claims Act seal requirement, but whether they will do so in a way that is counterproductive to the government's interests or whether they will instead impose other sanctions that would benefit the government, allow cases to go forward, and simultaneously create an effective deterrent. The message that you're hearing from State Farm is that no other sanction will be effective, that the rule will be toothless, it will be open season. But history belies this claim. Since 1986, when the False Claims Act amendments were enacted, there have been 10,593 Ketam actions filed. State Farm gave you an appendix with their petition where they list all the cases that they found that talk about the seal. That appendix has 48 cases in them. Only 35 actually involved seal violations. And of those, you know, an even smaller fraction, only six, involved findings of bad faith. Our rule has been the rule in this country since 1995, and in that time, we're talking about a handful of violations. In fact, strangely enough, the circuit that has the most seal violations in State Farm's appendix is the Sixth Circuit. It had six cases involving seal violations, four of which came up after the per se rule that the other side wants you to announce. Alito, when we issue an opinion in this case, it will change the legal landscape. And I would appreciate it if you would respond to one of the arguments Ms. Sullivan made toward the end, which is that if we issue an opinion that affirms in this case where there were, which involves the type, the greatest degree of bad faith in violating the seal requirement that is really possible to imagine, that would be the case that would stand for the principle in future cases that even in an instance in which there was complete bad faith, dismissal is not appropriate, or dismissal is can't properly be rejected. Fisherman, Sure. So there are two ways I'd like to answer the question. You know, first I want to answer just directly on its own terms, and then I do have some questions, issues about the premise. You know, directly on its own terms, I think it would be very easy for you to write an opinion to say nothing in this opinion condones what Mr. Scruggs did in this case. We think it would have been entirely appropriate for him to have been referred to Bar Counsel, for him to have been disqualified as the relator's attorney, for a substantial monetary sanction to be levied against him. In this case, there are factual findings, right? It's not just us hypothesizing. There's no ambiguity on this. Factual findings that are not clearly erroneous that the relators themselves were not culpable, did not know about these actions. And the ordinary rule in cases where a lawyer engages – I'm sorry? Sotomayor, you have it just on the top of your head somewhere, because I wanted to read this. Fisherman, Petition Appendix 67A is where you'll find the district court's finding on this, I believe. Sotomayor, Okay. Fisherman, You know, that the relators did not know. And then that was affirmed on it. Sotomayor, Okay. But parties are usually held accountable for the actions of their attorneys. Fisherman, To be sure, they are. And ordinarily, when the attorney is acting within the scope of representation – so if an attorney shows up and doesn't show up to a hearing, if an attorney files or doesn't file a document on the client's behalf, the client has to live with what's in those documents or with that non-appearance. But when attorneys engage in this sort of extrajudicial chicanery, you know, without their client's knowledge, the ordinary rule is you don't dismiss a case with prejudice. That's true in the vast majority of circuits, at least. And this Court hasn't really gotten into that. But that is the ordinary rule, and it makes sense. And that concern is heightened here, right, because as the statute makes clear, as Congress made clear in 1986, the government is also an interested party in this case, and an innocent one, that will suffer if dismissal is done. So I think you can check, you know, the potential that it will be open season with some well-worded and strongly-worded dictum in this opinion, no problem. Breyer, You see, I think this is done to protect the government's investigations. But the consequence of this is that there is a document somewhere in the Court that says Joe Smith is a defendant in what could be a very harmful case to Joe Smith. If Joe Smith is innocent, for example, it's unjustified. Where does he read about that? In a complaint? No. He reads about it in the national press. Now, that's a harmful thing. And seals are not just this case. There are national security cases, privacy cases, trademark cases, all kinds of business cases. So it is a serious thing when someone deliberately breaks a court seal and reveals the contents to the national press. Well, it's not just the Department that has an interest in this. It's the United States judicial system that has an interest in this. And that's what poses the problem. And your opponent here is saying, when you get to the bottom of it, given the seriousness of what went on, this is too light a sanction, at least that's how I'm seeing it. And I would appreciate your comments on that. Absolutely. So, you know, we don't diminish the seriousness of seal violations at all. But I think all of the examples you gave, Justice Breyer, really illustrate that what we're talking about here is a regime where district courts for ages have applied discretionary inherent powers-type rules or administered the federal rules of civil procedure and come up with case-specific appropriate sanctions based on the circumstances of each case, which is exactly what the district court did in this case. The district court was not blind to Mr. Scruggs' bad faith, took it into account completely, but understood that there were intervening facts here. And, you know, I think also, as we talk about how to proceed forward with this case, you know, it's worth just pausing for a moment on what's happened since. You know, this case now- Breyer, before you go, I want to get a more thorough answer to this, because- Sure. However this case got here, it's here. Yes. And so viewed in your legal framework that's most favorable, I can read to you, I can read your opponent as saying, look, say something and do something, like remand it, that realize, that makes people realize this is a very serious thing. Though, of course, I think you are right in saying this is the kind of thing that is not weighing various factors, but what would you want to add to say to me, no, he was not overly lenient here? Sure. So let me actually go back to what would have been the second half of my answer to Justice Alito. There are some issues with the premise that this was consummate bad faith conduct. I think in 1986, Congress made it clear that what it was trying to do was stop defendants from being tipped off about False Claims Act lawsuits. That was the goal. Consummate bad faith conduct would be a relator's lawyer reaching out to the defendant. Here what Scruggs did was a little bit different. Although he sent the evidentiary disclosure to the press, he sent it as background for their pieces. He informed them that it was under seal. And that's a characterization that State Farm has used, the background characterization page 8 of their brief and in all their briefs below. And so I think he was intimating to the folks he sent it to that it was not for further disclosure. Now, those folks happen to be journalists and State Farm from this reads, oh, isn't it so bad because journalists have a very large platform. Yeah, but journalists also have ethics. And the ethical rules of journalism wouldn't allow them to quote or attribute material that's given to them as background. And so I think there is a real sense in which the disclosures here were not intended to, you know, achieve the objectives that Congress was trying to prohibit in the seal requirement. So in that sense, I think this is not the archetypical bad faith conduct that Congress was talking about. Now, I am, you know, sensitive to your point about what about defendants' reputations. We don't think Congress cared about that in 1986. But even if it did, you know, and of course that is important in cases involving trade secrets and other kinds of seal orders. You know, the right remedy in all of those cases is damages to the defendant, right? It's not allow the defendant to get away with fraud against the government. And so that's why I started this part of the argument by saying, you know, the question is really not do we deter and punish. It's how. Are we going to do it in a way that makes sense or are we going to do it in a way that is counterproductive? Now, State Farm is upset because there's really not a great way to punish Mr. Scruggs anymore. He's been disbarred. He went to jail for a while and he's no longer a part of the case. In fact, Mr. Scruggs has not been part of this case for 3,148 days. That's how long ago he withdrew. In the intervening periods, we have had mountains of discovery, dozens of depositions, a jury trial showing that State Farm defrauded the government, a verdict affirmed on appeal, and now we're here. And, you know, a lot of water has gone under the bridge since then. And so, you know, to the extent, Justice Breyer, that what you're really asking is what can we do about this particular case? I think we ought to take that into account too. You know, there has been no misconduct now and no one accused of misconduct in this case for more than 3,000 days. And State Farm in the interim has been proven guilty. Now, State Farm says consider it all ex ante, right? Just ignore all of that. But that's not really, I think, the proper application of a discretionary test. You know, when you think about how to apply discretion in a particular case, I think we can be sensitive to reality. You know, we don't have to blind ourselves to what's happened. And I think that's the way that courts have always conducted these inquiries. The last thing that I want to point out, and then, you know, if there are no further questions, I'll rest, is that, you know, State Farm says that the statute asks very little of relators. That is just patently false. My clients spent a decade in these careers before they spotted a grievous fraud against the government. They blew the whistle. They lost their careers. They lost their jobs. Roberts. I think the point is it asks very little of them when it comes to the seal requirement. Just don't disclose it. That's not asking a lot. So State Farm's position on this has morphed a little bit over time. In the lower courts, they were arguing that the disclosure of the allegations or the substance of the fraud is itself, you know, a violation of the seal. Now they've kind of they kept that in footnote 10 of their opening brief. Now they've sort of pared it back. And I think now, finally, it's clear that they're not taking that position. And I think that that's true. I think also, though, the fact that it's very easy to comply with the seal takes a lot of wind out of the sails of their deterrence argument, right? As they understand the seal now, Mr. Scruggs or any attorney can avoid violating the seal by, like, editing a document for 20 minutes, right? The evidentiary disclosure that he sent to journalists, very easy to just include the allegations and strip out the details that reveal the existence of the lawsuit. And so you don't need a particularly and, you know, he doesn't get a lot of benefit in this case out of disclosing the allegations, the existence of the lawsuit, because, as Justice Sotomayor pointed out, the harm to the reputation, if your goal is to tar and feather the defendant in the press, the way you do it is by disclosing that they committed fraud, which is the way they did. Roberts, but, I mean, if Mr. Scruggs stands on the courthouse steps and discloses the underlying facts, I think people can put two and two together and realize that he just might be filing a lawsuit. I think that's possible, Your Honor. And so, you know, that gets back to the question of what is and isn't a violation. I don't understand them to be taking that position in this case. And those kind of close case situations, you know, they aren't really before you. And, you know, as the summary of the history of False Claims Act seal violations tells you, that kind of stuff really is not happening, right? I think that we're talking about a handful of cases, less than 0.3 percent of all False Claims Act cases have ever involved an arguable seal violation, and a vanishingly small fraction of those involve allegations of bad faith, right? So to the extent that State Farm wants you to adopt either a blanket rule of dismissal or even a rule that is geared toward dismissal through application of discretionary factors, they're really trying to throw the baby out with the bathwater here. It is a, you know, a dramatic overreaction, especially when, you know, as here, the government whose interests are principally affected is telling you that you don't need to do that. If there are no further questions. Alito, what do you make of the how much weight do you think should be given to the fact that the government doesn't think that dismissal is appropriate in this situation? Does the statute say that the complaint shall be filed under seal and shall be maintained under seal unless the government waives that? Not exactly. So for the first 60 days, the government definitely can't waive the seal. The seal can only be extended past 60 days at the government's motion. So there is a certain amount of discretion involved in whether the seal will continue. We think it kind of makes sense to afford the government more weight after that 60 day period. Here, the first seal violation didn't happen until day 103. And so, you know, we're kind of in that zone. So I think the government's should say should count for a lot, especially in this case. As a general proposition, you know, we're not urging like blind deference to the government or deference on issue of statutory interpretation. But we are saying it's very clear that Congress is principally concerned with protecting the government. And when the government tells you and, you know, there will always be a balance here, right? The government's interests may have been harmed by a seal violation. They weren't in this case, by the way. That's an important point. You know, there's a finding about that. State Farm admitted, you'll find a joint appendix, page 67, that they didn't learn about the lawsuit before the seal was lifted. And so, you know, there's no harm to the government here, but there would be harm from this for dismissal, right? They'll have to pick up the laboring or in a massive discovery effort to carry the case forward. It will cost a lot of money. It will prevent them from pursuing other frauds. And those are the types of interests that Congress was trying to deal with in 1986. Because in 1986, it was clear that there was a tidal wave of fraud against the government, more than the government could possibly hope to address using its own resources. And relators were marshaled as force multipliers to help with that effort. And every time the government has to take over for a relator, those resources come from somewhere. Even if the government gets a bigger recovery on the back end, those resources come from somewhere. And they take attention away from other frauds that the government could be pursuing, and they undermine Congress's objectives. And so when the rare case where the government steps in and says, dismiss this case because they've already intervened or some other idiosyncratic factors or they've decided it's important to send a message, we think courts should really listen. In this case, where the government has done the opposite, we think they should listen, too. Thank you. Roberts Thank you, counsel. Mr. Bash. Bash, Mr. Chief Justice, and may it please the Court, given the focus of the earlier portion of the argument, I will be happy to answer questions about why the automatic dismissal rule is wrong, but I will jump right to what we think the standard should be, how we think the Court ought to write the opinion, and then how we think the Court ought to dispose of this case. We think the standard for how to remedy a seal violation incorporates the basic background flexibility the district courts have always had to remedy violations of protective orders and sealing orders, as informed by the basic purpose of this provision, which I think, as everyone has acknowledged now, is to protect the government by making sure that potential targets of criminal and civil investigations are not tipped off. And the reason you need that in the FCA is because the filing of the complaint does something very special. It triggers the duty of the government to come in and say whether it's going to intervene. So that's why, Justice Sotomayor, it's not the factual allegations of fraud. It's actually the filing of the complaint, because that is what triggers a duty on behalf of the government to investigate and then tell the Court whether it's going to intervene. As far as the standard and the way this Court should write the opinion of the district courts, I think the standard should be that it should be that it should be that the statute. That was, I think, Congress's thinking in 1986, and I don't even really take Petitioner to disagree with that at this point. In terms of how to write the opinion. Sotomayor, but let's get to that, okay? Because do we look at the situation as it existed at the time of the violation and the risk it created, or do we look at it ex post facto and decide it didn't in fact happen, so there's no harm in it? Sotomayor, I don't think we look at the situation as it existed at the time of the violation and the risk it created, so there's no harm in it, so there's no harm. Shouldn't the severity be determined at the time it occurred? Giving a complaint to a news media is probably the best way to tip off a defendant. It's actually more likely to do it than failing to serve the government on time, for which many circuits automatically dismiss the complaint, even though that could be considered harmless if the government is served late and comes in and asks for an extension. And yet, there's a disparity in how courts are treating those situations. That's not necessarily at issue here. But what is at issue is what do we measure the appropriate sanction to be? And based on what evaluation? Let me take the general question and bring it to the facts here and then talk about that question of the disparity between how courts are treating different kinds of violations. The answer on the general question is they're both relevant. Under the standard articulated below and the standard we've advocated, you look at both the actual harm to the government, just like often attempt crimes are not punished as strongly as crimes that actually result in the harm, but you also look at the severity of the violation, and we think there's a direct correlation between the severity and the potential harm. If you actually give the complaint to the defendant, the potential harm is enormous. If you tell one person who's not affiliated with the defendant, the potential harm is less. So it's relevant in that way. And then, of course, there's intent and bad faith. And we don't discount that other factors could be relevant in idiosyncratic cases. We think in the mine run cases, those are the key factors. Let me just take it to the facts here. It's true as this is the case. This is a court order. People don't normally take it on themselves to decide whether to follow it or not. If you don't like it, lift it. But while it's there, follow it. And this court order does have a possible consequence in some case that if it is violated, it will cause harm to a defendant who learns for the first time that he is being sued by reading the New York Times. Okay? Now, that may or may not hurt some. It may hurt some a lot. Now, can that be taken into account, I would say, in an appropriate case? Absolutely. The court has to be concerned in working out a sanction, the overall fairness of the situation, and that's part of it. What do you think of that? I don't disagree with anything you said. I think a court could take that into account. It couldn't have made a difference here because those three journalists did not leak the suit to the public. So the State Farm couldn't have read about it in the New York Times. And what we think, while these violations were certainly in bad faith, what we think mitigates it and at least makes the district court – means that the district court did not abuse its discretion here is that it doesn't appear, as Mr. Singh was saying earlier, it doesn't appear this was designed to publicize this suit. Scruggs was representing a lot of clients bringing non-FCA suits. He did not, for example, leak this complaint to the media members. He leaked the evidentiary disclosures. And to be sure, they said that there was a lawsuit. But it seems designed to have been background for the general allegations of fraud for those three journalists. So it was intentional. It was in bad faith. But if the question is, did this district court abuse its discretion in declining to dismiss these relators with prejudice, who had already secured new counsel because the counsel responsible for this – But when would the government be hurt by a ceiling violation? I think what Congress had in mind is defendants taking steps to thwart the government investigation, for example, destroying evidence, declining to cooperate once they know that there is a formal investigation of them. I think that's what Congress had in mind. I'll note, though, that the Senate report, for those who look at that kind of thing, said that they expected – that the Senate expected that there would not be many instances where a seal violation would harm the government. So I don't think it's surprising that this hasn't happened often. And Mr. Singh referred to the appendix in the petition that lists 48 cases that supposedly involve seal violations. Petitioner put that together, obviously, at the cert stage. Some of those don't even involve seal violations. I think they said they relate to the seal requirement in some way. Ginsburg. In your brief, you did say, on page 27 of your brief, you said that reputational harm to the defendant could be relevant to determining a sanction for a seal violation. That's right, Justice Ginsburg, in any idiosyncratic case. And the reason I say idiosyncratic is, as we've discussed, lower courts have held and we agree that merely disclosing the allegations of fraud does not violate the seal. So the sort of reputational harm you'd be talking about is the incremental harm from the disclosure that a suit has been filed. Kennedy. You were going to tell us how to write the ideal platonic opinion? I wouldn't presume to say the platonic opinion, but to the extent the Court seeks our recommendation in how to write the opinion, we think that the overall focus should be courts should remedy these seal orders like they always remedy protective orders and seal orders, with a healthy dose of discretion, but in light of the purpose of this provision to protect the government. More specifically, the three factors identified by the courts below, actual harm to the government, severity of the violation, which I think correlates with potential harm, and intent or bad faith are the three key factors in a mind-run case. But we don't think the Court should exclude that in an idiosyncratic case, reputation – defendant's reputation or other factors could be relevant. We also think, Justice Alito, I think this responds to your questions about making sure to send a strong message that these violations will not be tolerated. We think the Court could have dismissed this case here. We don't say that it would have been an abuse of discretion to dismiss the case here. And I think if the Court's worried about sending the signal that intentional violations don't matter, it could say the district court would have been perfectly with it in its discretion to dismiss here. If State Farm had sought additional sanctions, the Court would have been in its discretion to refer counsel to the bar or to impose other sanctions, but they didn't seek that here. And the abuse of discretion standard, we think, should be particularly robust in this context because the government relies on the relator, the suit's not dismissed, the government doesn't intervene. There's a trial of however many days, as Mr. Singh said, and to unwind that all after the fact, I mean, I think it shows why the abuse of discretion standard should be particularly robust in this context. Mr. Chief Justice, I just wanted to raise a or respond to a specific question. Kagan, do you think deference ought to be given to the government, and if so, as to what parts of the test? What we say in the brief is deference ought to be given to the government's statement that it's been harmed. So we use the phrase substantial weight, and we're not wedded to that phraseology. But if the government comes in and says yes or no on harm, we think that should be given deference. On actual harm. Yes. But we didn't come in here and say either that or whether the suit should be dismissed. We just didn't say anything. And we think, as I said, that the Court would have been within its discretion to dismiss this case. We just think this Court ought to say this is a classic area for discretion. Mr. Chief Justice, Ms. Sullivan said she raised the question of the application of the – her client raised the question of misapplication all the way through. We sure don't read the petition to raise that question. It wouldn't be out of the ordinary for the Court to go on and say this is how the abuse of discretion standard ought to be applied. But they cited pages 17 through 19 and 26 through 28 of the petition. We don't read those to preserve an application argument. Those are making arguments like the multi-factor standard is difficult to apply. I think there's one sentence on page 28 that maybe you could read that way. We don't read that to have fairly preserved the application argument. And then just to end the waiver question, there's a whole other set of arguments they've made in their briefs that haven't come up at argument today about other violations that they think occurred that the lower courts held not to be violations. That is extremely far outside the scope of the question presented, and they haven't raised it at oral argument. But I just – that one is clearly waived, I think. Alitoso, on the issue of harm to the government, did I understand you to say that the question is actual harm and not likelihood of harm at the time of the disclosure? We think on that factor it's actual harm, but we think the second factor, severity, correlates with potential harm. So if you issue a press release saying we brought a suit, the potential for harm there is enormous, because the defendant is obviously – And do you think it might be helpful for this Court to clarify that when we're talking about the severity of the violation, part of what we're talking about is the potential harm that might cause harm? I think it would be helpful for the opinion to say that. I don't think the courts below were under a misapprehension about that. I mean, they talked about the most severe violation being like just a blatant failure – oh, I'm sorry, I see my red light's on. Well, you can finish your sentence. They talked about the most severe violation being just a blatant filing of the complaint publicly, and that is what correlates with potential harm versus selective disclosures to people that are not affiliated with the defendant. Thank you, counsel. Ms. Sullivan, four minutes. When you write the opinion, reversing or vacating, we – we trust that you will clarify that actual harm to the government is not a requirement for dismissal. And let me just remind you, in answer to your question, Justice Ginsburg, when will the government concede actual harm? It's not dispositive. It's dispositive if the government says there's actual harm, yes, or heavily weighted and possibly dispositive if they say it. But to remind you, as we point out on page 20 of our reply brief, the government hasn't admitted it was actually harmed, except in one case, the LeBlanc ITT case, in 30 years. So you should not require actual harm. We agree with the government that potential harm, which is important, is captured by the severity factor, but that the lower courts misapplied the severity factor by looking to what risk transpired rather than what risk occurred at the time of the disclosure. As to whether that was a serious risk, I must respectfully disagree that there was no possible tip-off here from the news statements. Mr. Singh referred you to page JA67, and he suggested that it's – that Statefarm wasn't tipped off at all. With respect, you can look for yourself and see Statefarm's lawyer saying, I can't say that we didn't have suspicion. We'd heard Congressman Taylor talking about his meeting with the Rigsby's. So there was a potential for tip-off here. And as to whether there was harm to the judicial system, as Justice Breyer pointed out, in addition to harm to the government, this is a case where a Gulfport jury found fraud against an insurer in the wake of the terrible losses from Hurricane Katrina. But the government, whose delegated power the relators are seeking to assert, found after three years of copious investigation, you can look for yourself on JA214, the government found that there, in the words of the Inspector General of the Department of Homeland Security at JA14, we find no indication that wind damage was attributed to flooding or that flood insurance paid for wind damages. If you're concerned, nonetheless, about any windfall to the defendants, it won't happen, because the government can come in and pick up this case and relate the complaint back to the time of the relator's filing. And finally, as to the Rigsby's involvement, if you have any factual questions about imputation, of course, that can be handled on remand for the application of a proper test that makes willfulness primary, severity assessed, ex ante, not ex post, and that does consider, as the government conceded it should, the defendant's reputational harm. The government concedes that on page 27, and you should adopt that in your test, as the Second Circuit did in Pylon. But as to the Rigsby's involvement, first, we think as a matter of law, there should be imputation. For lawyers, conduct to their clients in most cases, but certainly in key TAM cases where the relators cannot represent themselves pro se. No one can represent the government. You can't be a pro se lawyer representing the government. The lower courts are clear. You must have a lawyer. Hallstrom said a trained lawyer who made an inadvertent mistake still bound his client to the failure of the pre-filing notice requirement. We think imputation here is easy as a matter of law. But if you think it's a question of fact, then if you look to Mr. Singh cited you to, Justice Breyer, to Petition Appendix 67A, it's actually Petition Appendix 68A where you'll find the key evidence about the relator's relationship to Scruggs. And I commend that page to you because it did not find them not culpable. At 68A of the Petition Appendix, it didn't find the relators not culpable. It found them to have not approved, authorized, or initiated the disclosures. That's not the same as not being intimately involved with those disclosures. And I refer you to the district court's findings here in disqualifying prior plaintiffs' counsel at JA 16 and 20 that there was a sham contract. I don't know many lawyers who pay their clients, but this time Scruggs paid the Rigsby's to be their material witnesses, their employees, their joint venturers. You can look either to the Northern District of Alabama docket where Judge Acker found them conjoined, Scruggs and the Rigsby's, and to be joint venturers, or you can look to Judge Senter's decisions in this docket where he finds that the relationship was a sham. And you can say that it would be inappropriate and abuse of discretion not to find imputation here. With respect, we ask that you reverse or remand for decision on a proper balancing test that doesn't give carte blanche to these kinds of bad faith violations, which harm not just the government in the long run, but our system of justice. Thank you. Roberts, Thank you, counsel. The case is submitted.